UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DS PARENT, INC.; and
DAVIS-STANDARD, LLC

                         Plaintiffs,

        -against-                                    5:13-CV-1489 (LEK/DEP)

DONALD TEICH; and SAM NORTH
AMERICA, LLC,

                         Defendants.
_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

        Plaintiffs DS Parent, Inc. ("DS") and Davis-Standard, LLC ("Davis") (collectively,

"Plaintiffs" or "Davis") have moved for a preliminary injunction enjoining Defendant Donald Teich

("Teich"), a former Davis employee, from, *inter alia*, working for his current employer, Defendant

SAM North America, LLC ("SAM").  Dkt. No. 12 ("Motion"); see also Dkt. No. 14

("Memorandum").  Because Plaintiffs have failed to demonstrate that noncompete agreements

bound Teich or that Plaintiffs have protectable interests, the Motion is denied and the January 13,

2014 Temporary Restraining Order is, to the extent it remains in effect, dissolved.  See Dkt. No. 18

("TRO").

## II.   BACKGROUND

        Davis builds and sells converting and extrusion machines, including "liquid coating"

equipment,[1] based on its customers' specifications.  Dkt. No. 7 ("Amended Complaint") ¶¶ 17-18.

_____

        [1] In liquid coating, a "substrate (which may be paper, film, fabrics, etc.) is unrolled,
treated/coated with certain liquids, then dried and rolled up again. Its applications are found
everywhere: for example, in tapes or labels, in silicone coating for adhesive packaging, in specialty

Teich began working for a Davis predecessor in 1987 and served as a salesman and an executive. Id. ¶¶ 19-20. From 2002 until 2013, Teich worked in Davis's (and it predecessor's) liquid coating division, first as a district sales manager and subsequently as Vice President for Liquid Coating, although he returned to a sales position at his request in April 2013. Id. ¶¶ 22-23, 44.

In January 2012, incident to DS's acquisition of Davis, Teich entered into an employment agreement containing: (1) a noncompete provision prohibiting Teich, were he to resign from Davis or be terminated with cause, from working for a domestic competitor for two years; (2) a nonsolicitation provision prohibiting Teich from soliciting Davis's customers for the same two-year period; and (3) a nondisclosure provision indefinitely prohibiting Teich from disclosing Davis's trade secrets or confidential information. Id. ¶¶ 24-26; Dkt. No. 7-1 ("Employment Agreement") ¶¶ 5, 7.[2]

Teich was also given the option to purchase DS stock pursuant to a securities purchase plan ("Plan"). Am. Compl. ¶ 51. He did so by signing a joinder agreement and participation election form pursuant to which he became a party to, and bound by, a Stockholder Agreement. Am. Compl. ¶¶ 51, 54-55; Dkt. Nos. 7-5 ("Participation Form"); 7-2 at 2-90[3] ("Stock Agreement"); id. at 90-92 ("Joinder Agreement"). The Stock Agreement contained restrictive covenants prohibiting Teich, upon termination of employment, from working for any competitor or soliciting Davis's

---

coating for traffic signs and water-resistant fabrics, or in tinted acrylic plastic used to darken car and building windows." Dkt. No. 7 ("Amended Complaint") ¶ 18.

[2] The Employment Agreement is governed by Connecticut law. Employment Agreement ¶ 14(a).

[3] The pagination corresponds to the page numbers assigned by ECF.

customers or employees for a one-year period.[4]  Stock Agreement at 27-29; Am. Compl. ¶¶ 3, 52.[5]

Teich resigned from Davis on November 14, 2013.  Am. Compl. ¶ 62.  A week later, he informed Plaintiffs that he had accepted an offer of employment with SAM.  Id. ¶ 63.  SAM and its affiliate also produce machines, including liquid coating machines, pursuant to customer specifications.  Dkt. No. 26-1 ("Christie Declaration") ¶¶ 9-10.  Teich was hired as a Vice President of Sales responsible for SAM's North American liquid coating business and its South and North American gravure printing business.  Dkt. No. 21 ("Teich Declaration") ¶ 81; Dkt. No. 26-1 at 51.[6]

On November 22, 2013, Teich filed a complaint in New York Supreme Court seeking a declaration that the restrictive covenants in the Employment and Stock Agreements were unenforceable.  Am. Compl. ¶ 64; Teich Decl. ¶ 81; Dkt. No. 13-1.  Davis then removed that action.  See Dkt. No. 13 ¶ 11; Teich v. Davis-Standard, LLC, No. 13-CV-1533, Dkt. No. 1 (N.D.N.Y. Dec. 12, 2013).[7]  Davis also filed this action seeking to enforce the Stock Agreement and a separate action in the District of Connecticut seeking to enforce the Employment Agreement.  See Dkt. Nos. 1 ("Complaint"); 13-2.  The parties entered into a stipulation dismissing the Connecticut action and agreeing to adjudicate the Employment Agreement in this action.  Dkt. No. 13 ¶ 13; 13-6 ("Stipulation").  Plaintiffs then filed the Amended Complaint, which seeks to enforce both

_____

[4] The Stock Agreement is governed by New York Law.  See Stock Agreement ¶ 13; Mem. at 16 n.6.

[5] Plaintiffs do not argue that Teich is bound by any nondisclosure provision in the Stock Agreement.  Compare Am. Compl. ¶ 2 (noting nondisclosure provision of the Employment Agreement), with id. ¶ 3 (mentioning only noncompete and nonsoliciation provisions in the Stock Agreement); see also id. ¶¶ 57-59 (describing relevant provisions of the Stock Agreement).

[6] The pagination corresponds to the page numbers assigned by ECF.

[7] That action was subsequently dismissed by stipulation of the parties.  Teich v. Davis-Standard, LLC, No. 13-CV-1533, Dkt. No. 6.

Agreements. See generally Am. Compl. Plaintiffs subsequently filed the Motion, which sought

both a temporary restraining order and a preliminary injunction. Mot. The Court issued the TRO,

which enjoined Teich, pending "further notice of th[e] Court," from working for SAM or another

Davis competitor, soliciting Davis customers or clients, or using any trade secrets or confidential

information. See Dkt. No. 18 ("TRO").[8] Plaintiffs were subsequently ordered to post bond and did

so. Dkt. Nos. 28-29. Defendants responded to the Motion and Plaintiffs replied. See Dkt. Nos. 21-

1 ("Teich Response"); 26 ("SAM Response"); 30 ("Reply"). Oral argument was held on January

22, 2014. Dkt. Nos. 36; 43 ("Transcript").

## III. LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine

matter." Patton v. Dole, 806 F.2d 24, 28 (2d Cir. 1986). "The purpose of issuing a preliminary

injunction is to 'preserve the status quo and prevent irreparable harm until the court has an

opportunity to rule on the . . . merits.'" Candelaria v. Baker, No. 00-CV-0912, 2006 WL 618576, at

*3 (W.D.N.Y. Mar. 10, 2006) (quoting Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994)).

To prevail on a motion for preliminary injunctive relief, a movant must show: (1) irreparable harm;

and (2) either (a) a likelihood of success on the merits of the claim, or (b) sufficiently serious

questions going to the merits of the case to make it a fair ground for litigation, and a balance of

hardships tipping decidedly in favor of the moving party. D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.,

465 F.3d 503, 510 (2d Cir. 2006). A preliminary injunction "should not be granted unless the

---

[8] The parties dispute whether the TRO remains in effect or automatically expired after fourteen days. Dkt. Nos. 37-39. Because the Court determines that a preliminary injunction is not warranted, the TRO is, to the extent it remains in effect, dissolved. See Javino v. Pergament, No. 13-CV-1951, 2013 WL 1952639, at *1 (E.D.N.Y. May 10, 2013) (noting that the standard for granting a preliminary injunction and a TRO is the same).

movant, by a clear showing, carries the burden of persuasion." <u>Moore v. Consol. Edison Co.</u>, 409

F.3d 506, 510 (2d Cir. 2005).

## IV.    DISCUSSION

### A.  Likelihood of Success on the Merits.

Plaintiffs bring a number of claims: (1) breach of contract against Teich for breach of the

Employment and Stock Agreements; (2) misappropriation of trade secrets against Teich; (3) tortious

interference with the Employment and Stock Agreements against SAM; (4) unfair competition

against SAM and Teich; and (5) breach of the implied covenant of good faith and fair dealing

against Teich.  Am. Compl. at 23-29.  Because a determination of the likelihood of success of the

breach of contract claims largely determines the likelihood of success on Plaintiffs' other claims,

the Court turns to those claims first.  As discussed below, Plaintiffs have failed to make the

requisite showing because it is likely that: (1) Teich was released from the Employment

Agreement's noncompete and became subject to the Stock Agreement's noncompete by a unilateral

mistake caused by Plaintiffs' misrepresentations; and (2) the Agreements' restrictive covenants,

even if they otherwise applied, are unenforceable in light of Plaintiffs' failure to identify any

protectable interests.

#### 1.  Breach of Contract

##### a.  Contractual Effectiveness  of the Restrictive Covenants

###### i.  Employment Agreement

The Employment Agreement releases Teich from its noncompete[9] provision if Davis

---

[9] Davis notes that the release does not apply to the nonsolicitation and nondisclosure
provisions.  <u>See</u> Employment Agreement ¶¶ 5-7; Reply at 13 n.10.

"reduce[d] its efforts in the liquid coating markets" by, *inter alia*, "1) Ending or severely reducing its participation in trade shows, conferences, trade print advertising, website, etc.; or 2) Permanently allocating existing liquid coating resources to other product areas." Employment Agreement ¶ 5.[10]

Teich has asserted that Davis reduced its liquid-coating efforts by "severely reduc[ing] its participation on trade print advertising for liquid coating." Dkt. No. 13-5, Ex. 8 ("Resignation Letter"); see also Dkt. No. 26-1 at 38-39 (noting that, as of June 2013, there had been a decrease in advertising). Davis responded to Teich's claims by asserting that Davis "does very little print advertising." Dkt. No. 26-1, Ex. 9. But the inclusion of the print-advertising release indicates that Davis engaged in print advertising substantial enough to allow for the possibility of a "severe reduction"—otherwise, the release provision would be a nullity. Plaintiffs have not provided evidence or argued that they did not severely reduce their trade advertising. Thus, the record indicates that print advertising was severely reduced. Moreover, while Davis also asserted that it did support "several major trade show events" during 2013, it does not indicate that this support represented an increase over prior years and therefore that the advertising reduction had been offset. Dkt. No. 26-1, Ex. 9. Thus, Davis has not demonstrated a likelihood that it did not reduce its liquid

---

[10] The Employment Agreement contains another release provision premised on Davis's failure to accept Teich's recommendations and its concomitant loss of market share. Employment Agreement ¶ 4. For this release provision to apply, Teich had to submit a notice of termination and provide Davis with a thirty-day period in which to develop and begin implementing a plan to cure its putative failure. Id. Davis suggests, without discussion, that the market-share-loss, notice, and cure-period requirements also applied to the release provisions involving reduced marketing and permanent reallocation of resources. Am. Compl. ¶ 33. But the plain text of the Employment Agreement indicates otherwise. The Employment Agreement states that Teich "will be released" from his noncompete obligations if liquid coating participation is reduced through, *inter alia*, severely reduced marketing or permanent re-allocation of resources. Employment Agreement ¶ 4. A new paragraph then begins with the phrase "In addition to the foregoing" and proceeds to introduce the additional possibility of release by submitting a notice of termination regarding the non-acceptance of recommendations. Id.

coating market participation by severely reducing advertising, and therefore has not demonstrated a likelihood that Teich was not released from the Employment Agreement's noncompete.

Teich also alleges that he was released from the noncompete because Davis permanently allocated liquid coating resources to other product areas. See Resignation Letter. He provides unrebutted evidence that Davis terminated a liquid coating product manager (one of three members of the liquid coating group) and a salesperson who sold liquid coating along with Davis's other products (one of five who did so). Id.; Teich Decl. ¶¶ 33, 41; Dkt. No. 26-1 at 39. Teich has not presented any specific evidence that these positions or their salaries were permanently allocated to other product areas. However, he does note that a Davis executive stated around the time of these layoffs that the liquid coating division had "the lowest ability to win and the lowest market attractiveness" of all of Davis's product lines, Teich Decl. ¶ 49, thereby implying that available resources would be allocated to other product lines. Moreover, Davis has not presented any evidence that it has replaced either of these terminated employees. See generally Mem.; Reply. Although it does allege that it made some efforts at hiring, these efforts had either not come to fruition (or even begun) at the time of Teich's departure or involved non-liquid-coating-dedicated personnel. See Teich Decl. ¶ 51; Dkt. No. 26-2 ¶¶ 1-4.[11] Thus, Davis has not demonstrated a likelihood that it had not, at the time Teich resigned, allocated resources away from the liquid coating division. Davis has therefore failed to demonstrate a likelihood that this release provision was not triggered.

---

[11] Plaintiffs argue that Teich's Declaration admits that he opposed the hiring of a China-based liquid-coating-dedicated salesperson. See Reply at 11 (citing Teich Decl. ¶ 46). But according to Teich, he told Davis executives that, *if* the company were to hire only one liquid coating employee, its first priority should be to hire an engineer for its liquid coating plant in Fulton. Teich Decl. ¶ 46. Rather than outright opposing the hiring of an employee in China, Teich states that he interviewed a candidate and recommended that he be hired. Id. ¶ 51.

ii. Stock Agreement

Under New York law, a contract may be reformed or rescinded if it is the product of a mutual mistake.[12]  See John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co., 717 F.2d 664, 671 (2d Cir. 1983).  However, "a contract may [also] be reformed if there is . . . a mistake by one party coupled with fraud or inequitable conduct of the other party."  Id.  Inequitable conduct includes deception or even mere awareness of the other party's mistake combined with superior knowledge of the subject of that mistake.  See id.; Koam Produce, Inc. v. DiMare Homestead, Inc., 329 F.3d 123, 127 n.3 (2d Cir. 2003) ("Under New York law, in order for a court to allow rescission of a contract on the basis of a unilateral mistake, a party must establish that . . . the other contracting party either knew or should have known that such mistake was being made."); Middle E. Banking Co. v. State Street Bank Intern., 821 F.2d 897, 906 (2d Cir. 1987) ("New York courts will . . . rescind contracts . . . even in the absence of fraud where unilateral mistake is established[;] the mistake must be one which is known or ought to have been known to the other party." (citation and internal quotation marks omitted)); Frontier-Kemper Constructors, Inc. v. Am. Rock Salt Co., LLC, No. 01-CV-6217, 2005 WL 3018720, at *13-14 (W.D.N.Y. Oct. 18, 2005) ("At the very least, the opposing party must have withheld information which the party seeking rescission or reformation did not have at the time of making the contract."); cf. Flower City Painting Contractors, Inc. v. Gumina Const. Co., 591 F.2d 162, 168 (2d. Cir. 1979) (Oaks, J. dissenting) ("[Where] one party, the one in the more favorable bargaining position and the one which had drawn the contract, had made a unilateral mistake [regarding] the terms of a contract . . . , this kind of mistake does not permit repudiation, rescission, or modification of the contract.").

---

[12] As noted *supra*, New York law governs the Stock Agreement.

8

Teich argues that Davis's internal communications to potential Plan-participating employees indicated that there would be no noncompete provisions in the Stock Agreement.[13] On January 27, 2013, prior to signing Teich's signing of the Joinder Agreement and Participation Form, he and other Davis employees received an "Anticipated Questions and Answers" ("Q&A") and a summary ("Summary") from Davis regarding the Plan and the Stock Agreement. Teich Decl. ¶¶ 25-26, Dkt. No. 7-4 . The accompanying cover letter from Davis's CEO stated that the Stock Agreement was "difficult to understand" and therefore the Q&A was "designed to address some of the more typical questions about the [Stock Agreement]." Dkt. No. 7-4 at 2.[14] One of the questions and responsive answers was as follows:

> QUESTION: DO I HAVE TO SIGN A NON-COMPETE TO BE ELIGIBLE TO BUY SECURITIES IN THE COMPANY
>
> Answer: Yes. In Order to be eligible to participate in the Plan, you will be required to execute the Company's standard form employment agreement (included in Exhibit H) that contains a 2 year non-compete clause. Note, some of you may have already executed this agreement. Please contact Michael Bontempo . . if you have any questions or are uncertain whether you have already signed the correct employment agreement.

Dkt No. 7-4 at 5-7. No employment agreement was attached as Exhibit H. See Dkt. No. 7-4 at 27.

The Summary also included the following language in two separate places, prominently set off from the rest of the text in dedicated sections:

> Pursuant to the standard form employment agreement which Participants will be required to execute in order to be eligible to participate in the Plan, during a Participant's period of employment with the Company and during the 24-month period after the termination of such employment relationship, the Participant is prohibited from competing with the company . . . in certain designated markets.

---

[13] Teich was never provided with a copy of the Stock Agreement. Teich Decl. ¶ 30.

[14] The pagination corresponds to the page numbers assigned by ECF.

Dkt. No. 7-4 at 9, 15.  The Summary does indicate elsewhere that the Stock Agreement itself contains a noncompete provision and does describe that noncompete and its one-year duration.  Id. at 12-13.  However, it does so only once and in an easily overlooked location: the final paragraph of an eight-paragraph section labeled "Joinder to Stock[] Agreement" that focuses on the transfer and sale of stock.  Id. at 13.

Teich alleges that the Q&A and the Summary indicated that he would be subject only to the standard, two-year noncompete in the Employment Agreement that he had signed a few weeks earlier.  Id. ¶ 28.  His interpretation is eminently reasonable.  The documents Teich received repeatedly stated that the required noncompete was part of an "employment agreement."  The Employment Agreement clearly constituted an employment agreement and was labeled as such; the Stock Agreement was neither labeled as, nor otherwise constituted, an "employment agreement." Moreover, the Q&A indicates that the noncompete was part of an agreement that some employees "may have already executed."  Teich had "already executed" the Employment Agreement.  In contrast, the Q&A and Summary were issued as a precursor to the signing of the Joinder Agreement and Participation Form, and thus neither Teich nor any other employee had "already executed" the Stock Agreement and its noncompete provisions.  Moreover the Q&A and Summary reference a two-year noncompete—the same term as the Employment Agreement's noncompete—whereas the Stock Agreement's noncompete provides that Teich would be covered for a one-year term.[15]  See Mem. at 1-2.

---

[15] The single, easily overlooked mention of the Stock Agreement's noncompete does not alter this analysis, particularly in light of the principle that "ambiguities in contracts must be construed against the drafter."  McGowan v. Great N. Ins. Co., 962 N.Y.S.2d 638, 715 (App. Div. 2013).  This principle logically extends to documents describing a contract where the same party has drafted both the documents and the contract.

Teich argues that these documents render the Stock Agreement's noncompete the product of mutual mistake: each party believed that the only noncompete that would bind Teich was the one contained in the Employment Agreement. <u>See</u> Teich Resp. at 7-11. Plaintiffs conclusorily respond that they were not mistaken. <u>See</u> Reply at 6 n.5. The Plan documents indicate otherwise. However, Teich need not show that Plaintiffs were mistaken, because he has demonstrated unilateral mistake. Teich has provided unrebutted evidence that, at the time he signed the Joinder Agreement and Participation Form, he believed he was not agreeing to an additional noncompete because of misrepresentations by Davis. Moreover, he has also provided evidence that Davis was aware of his mistake: given Teich's recent refusal to sign the Employment Agreement without the addition of the release provisions, <u>see</u> Teich Decl. ¶¶ 19-21, Davis had reason to know that Teich was unaware that he was agreeing to be bound by the Stock Agreement's noncompete, which contained no release. And Davis certainly possessed superior knowledge of the subject of Teich's mistake: it drafted the Stock Agreement and its noncompete provisions, whereas Teich did not even receive a copy of the Stock Agreement.

Davis responds that Teich should have requested a copy of and read the Stock Agreement. Reply at 6 n.5. But Davis's misrepresentations and assurances induced Teich not to do so—in light of Teich's fierce negotiation of the releases in his Employment Agreement, it seems probable that, had he known that the Stock Agreement might contain a noncompete, he would have, at the very least, insisted on receiving a copy.[16] <u>See</u> <u>Rush v. Oppenheimer & Co., Inc.</u>, 669 F. Supp. 652, 653 (S.D.N.Y. 1987) (refusing to enforce contract where evidence that defendant induced plaintiff to sign by materially misrepresenting contract as "a formality . . . [that] need not be read").

---

[16] This is particularly so in light of the cover letter's description of the Stock Agreement as "difficult to understand."

Finally, Davis implies that its informing Teich of the Stock Agreement's noncompete provisions prior to his departure somehow negates any claim of mistake. <u>See</u> Reply at 6 n.5. But Teich's subsequent knowledge has no bearing on his mistakenness at the time he agreed to be bound by the Stock Agreement. Mistake is a contract-formation defense; a party cannot induce another to mistakenly agree to a contractual provision and then bind the mistaken party by shouting "gotcha!" and disclosing the mistake.[17] Thus, the Court finds it likely that Teich will be able to rescind the Stock Agreement or reform it so as to remove its noncompete.

### b. Enforceability of the Agreements

Teich has shown that it is unlikely that Plaintiffs can prevail on their breach of contract claims, because neither of the noncompete provisions he allegedly has breached, or will inevitably breach, apply to him. But even if both of the Agreements' noncompetes bound Teich, Plaintiffs have failed to demonstrate a protectable interest and therefore have not demonstrated a likelihood that the noncompete, the nonsolicitation provisions, or the Employment Agreement's nondiclosure provision are enforceable. "[C]onsiderations of public policy militate against the enforcement of restrictive covenants of future employment." <u>Sprinzen v. Nomberg</u>, 389 N.E.2d 456, 460 (N.Y. 1979). Therefore, under New York law, "enforcement [of noncompete covenants] will be granted to the extent necessary (1) to prevent the employee's solicitation or disclosure of trade secrets, (2) to prevent the employee's release of confidential information regarding the employer's customers, or (3) in those cases where the employee's services to the employer are deemed special or unique."

---

[17] Davis's disclosure regarding the existence of the Stock Agreement's noncompete would be relevant if Teich ratified that provision by continuing to accept the benefits of the Stock Agreement after disclosure. <u>See</u> <u>737 Park Ave. Acquisition LLC v. Shalov</u>, 964 N.Y.S.2d 533, 534 (App. Div. 2013). Davis has not argued or offered evidence that Teich did so. <u>See generally</u> Mem.; Reply.

Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 70 (2d Cir. 1999); see also BDO Seidman v. Hirshberg, 712 N.E.2d 1220, 1223 (N.Y. 1999). Similarly, under Connecticut law, noncompetes will not be enforced where doing so does not serve "the employer's need to protect legitimate business interests, such as trade secrets and customer lists." Deming v. Nationwide Mut. Ins. Co., 279 Conn. 745, 761 (2006) (citation omitted and emphasis added); see also New Haven Tobacco Co. v. Perrelli, 18 Conn. App. 531, 536 (1989) ("In order for [a restrictive covenant] to be reasonable, it first must be determined that the employer is seeking to protect a legally recognized interest."). Thus, unless Plaintiffs can demonstrate the existence of a protectable interest, their Motion must be denied.[18]

A party seeking a preliminary injunction must identify with specificity the protectable interests at issue. See Vbrick Sys., Inc. v. Stephens, No. 08-cv-1979, 2009 WL 1491489, at *9 (D. Conn. May 27, 2009) (refusing to issue preliminary injunction where employer failed to offer proper "evidentiary basis" for its assertion of protectable information); H. Meer Dental Supply Co. v. Commisso, 702 N.Y.S.2d 463, 465 (App. Div. 2000) (denying preliminary injunction where plaintiff failed to identify the "specific data" constituting a protectable interest); WebMD Health

_____

[18] This is true not only with respect to the Agreement's noncompete provisions, but also with respect to their nonsolicitation provisions and the Employment Agreement's nondisclosure provision. See Arakelian v. Omnicare, Inc., 735 F. Supp. 2d 22, 41 (S.D.N.Y. 2010) (noting that the requirements for enforcing noncompetes "appl[y] with equal force to covenants not to solicit a former employee's clients and employees; solicitation is simply a form of competition"); Vbrick Sys., Inc. v. Stephens, No. 08-cv-1979, 2009 WL 1491489, at *1-2, *8-10 (D. Conn. May 27, 2009) (denying motion to enforce noncompete and nondisclosure provision where employer failed to demonstrate protectable interest); Estee Lauder Cos. v. Batra, 430 F. Supp.2d 158 (S.D.N.Y. 2006); Scott v. General Iron & Welding Co., Inc, 171 Conn. 137, 137 (1976) ("In order to be valid and binding, a covenant which restricts the *activities* of an employee following the termination of his employment . . . should afford only a fair protection to the interest of the party in whose favor it is made." (emphasis added)).

Corp. v. Martin, No. 601654-06, 2006 WL 1892261, at *9 (N.Y. Sup. Ct. July 11, 2006) (denying injunction where plaintiffs provided "conclusory statements and heavily redacted emails" regarding putatively protected information); see also MSCI Inc. v. Jacob., 945 N.Y.S.2d 863, 865 (Sup. Ct. 2012) ("[T]he law requires that a trade secret plaintiff identify trade secrets with reasonable particularity early in the case.").

### i. Trade Secrets

#### 1) Definition

"Under New York law, a trade secret is defined as any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." EarthWeb, Inc. v. Schlack, 71 F. Supp. 2d 299, 314 (S.D.N.Y. 1999) (internal quotation marks and citation omitted). In determining whether a trade secret exists, New York courts consider the following factors: (1) the extent to which the information is known outside of the former employer's business; (2) the extent to which it is known by the former employer's employees and others involved in the employer's business; (3) the extent of measures taken by the former employer to guard the secrecy of the information; (4) the value of the information to the former employer and its competitors; (5) the amount of effort or money expended by the employer developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2d Cir. 1990). "The most important factor is whether the information is secret." Thin Film Lab, Inc., v. Comito, 218 F. Supp. 2d 513, 520 (S.D.N.Y. 2002).

Trade secrets are similarly defined under Connecticut law pursuant to the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. § 35–50 et seq., which "codifies the basic

principles of common law trade secret protection." <u>Complete Energy, Inc. v. Fox</u>, No. 116004252S, 2013 WL 812483, at *2 (Conn. Super. Ct. Jan. 25, 2013) (alterations omitted).  A trade secret is "information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Conn. Gen. Stat. § 35–51(d).

### 2)  Technology

Plaintiffs argue that Teich's knowledge of the technical processes involved in the production of Davis's machines constitutes a trade secret.  <u>See</u> Reply at 8 (citing Dkt. No. 13-3 ("Stevenson Declaration") ¶¶ 7-12); Stevenson Decl. ¶¶ 7-12.  They conclusorily allege that Teich has "intimate knowledge of the science and engineering of the liquid coating systems built and sold by Davis-Standard, including the empirical testing and trial-and-error that Davis-Standard has performed over the years."  Stevenson Decl. ¶ 8; Am. Compl. ¶ 36 .  But Plaintiffs point to no specific technology. <u>See generally</u> Mem.; Reply.  Instead, they analogize the unspecified technological trade secrets to Coke's "secret formula."  Stevenson Decl. ¶ 19.  This does not suffice.

In response, Defendants present expert evidence that "[i]n terms of machine technology, there are no secrets with respect to liquid coating machinery.  The machinery and the hardware are mature and all suppliers of liquid coating machinery essentially construct the machinery in the same manner."  Christie Decl. ¶ 27.  Indeed, according to Defendants, the standard technology involved in liquid coating machines is widely shared and discussed in technical papers and industry publications.  <u>Id.</u> ¶¶ 29-31; <u>see also</u> Dkt. No. 26-1 at 13-35.  Defendants further assert that, to the

extent a customer requires machinery that employs non-standard technology, the *customer's* engineers design the machinery, and machine suppliers like Davis merely carry out those specifications—specifications that the customer protects with nondisclosure agreements that ensure Davis cannot subsequently use those specifications or technology with any other customer. Id. ¶¶ 35-36; Teich Decl. ¶ 68. Plaintiffs have offered no evidence refuting these assertions. See generally Mem.; Reply. Thus, the Court cannot conclude that Teich has acquired any technological knowledge *belonging to* Davis or having any utility to Davis or its competitors.

3) Strategy

Davis also references Teich's "strategic knowledge" of Davis's liquid coating business. Mem. at 8. See also Am. Compl ¶ 35 (alleging that Teich knows Davis's "capabilities and strategies"). But Davis points to only two specific instances of this strategic information. First, it references the Teich-authored 2012 and 2013 strategic plans for the liquid coating division. Stevenson Decl. ¶ 7. The only evidence Plaintiffs offer as to the content of these plans is the declaration of a Davis employee who states that he is "personally . . . not familiar with the details set forth [in the plans]" and outlines their content in broad strokes: "The strategic focus for the company, identifying world-wide opportunities for growth, and assessing the strength and limitations of Davis-Standard's liquid coating line of business." Id. Davis also points to email communications between Teich and supervisors regarding the liquid coating division. See Reply at 1, 13 (referencing Dkt. No. 26-1 at 37-50). These emails contain Teich's relatively non-specific assessments of the quality and need for overhaul of Davis's equipment and labs; the need for qualified, liquid-coating-dedicated salespeople, engineers, and product managers; the fact that cost had led to order losses; the role of the weak dollar in making Davis's machines more affordable than those of its European competitors; the willingness of younger engineers and managers at

16

customers to "gamble" on SAM even though it was a South Korean company; the need to create "awareness" of Davis's coating equipment; the need for liquid-coating-dedicated employees in Asia; general industry and manufacturing areas of profitability; potential new types of coating businesses; Davis's high installation costs; the good performance of Davis's price-quotations personnel; the need to partner with suppliers of certain parts; and targets for new liquid-coating expenditures. Dkt. No. 26-1 at 36-50. The type of information contained in the strategic plans and communications has generally been held not to be a trade secret. See Silipos, Inc. v. Bickel, No. 06-cv-02205, 2006 WL 2265055, at *4 (S.D.N.Y. Aug. 8, 2006) ("[T]rade-secret protection does not extend to information regarding 'market strategies.'"); LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 499-500 (S.D.N.Y. 2002) (noting that "information consisting simply of business possibilities or goals is not a trade secret" and finding it highly unlike that an "amalgamation of business concepts, strategies, and ideas to be used in the eventual construction of a marketable computer software program" constituted a trade secret); EarthWeb, Inc. v. Schlack, 71 F. Supp. 2d 299, 315 (S.D.N.Y. 1999) ("[K]nowledge of . . . future acquisition plans . . . is generally not considered a trade secret."); Marietta Corp. v. Fairhurst, 754 N.Y.S.2d 62, 67 (App. Div. 2003) (finding that "pricing data and market strategies" do not constitute trade secrets). Moreover, Teich alleges Davis all but ignored the recommendations he had made 2012 and 2013 strategic plans. See Teich Decl. ¶¶ 31-52. Davis's failure to follow Teich's strategic advice weighs heavily against finding that advice to be a trade secret: there is little value to Davis or a competitor in plans that Davis does not carry out. Moreover, to the extent the strategic plans and communications laid out Davis's inadequate investment in its liquid coating division, SAM asserts that this information was widely known throughout the industry. Christie Decl. ¶¶ 22-23, 39.

Although Davis does point to cases where strategic information has been found to constitute

a trade secret, <u>see</u> Mem. at 19-20, such information either accompanied technological trade secrets, <u>see</u> <u>Int'l Bus. Machines Corp. v. Papermaster,</u> No. 08-CV-9078, 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008); <u>Misys Intern. Banking Sys., Inc. v. TwoFour Sys., LLC</u>, No. 650101, 2004 WL 3058144 (N.Y. Sup. Ct. Nov. 23, 2004) (finding trade secrets where employee had knowledge of pricing and the "functional design" of the employer's proprietary software product), or involved detailed information about new products, <u>see</u> <u>Estee Lauder</u>, 430 F. Supp. 2d at 176 (finding trade secrets where employee was knowledgeable about marketing plans and "confidential products currently under development and product innovations scheduled for the coming years" and possessed "confidential information about the stage of development of products in the pipeline"); <u>Lumex, Inc. v. Highsmith</u>, 919 F. Supp. 624, 629-30 (E.D.N.Y. Mar. 19, 1996) (finding information regarding "objectives" and "profit margins" confidential where they related to specific "new and future equipment" developed by employer). Plaintiffs have not shown that Teich's strategic knowledge accompanied technological trade secrets or involved specific aspects of new products. <u>See generally</u> Mem.; Reply.

### 4) Pricing

Plaintiffs also argue that Teich knows how much Plaintiffs have bid for machines for which a customer has not yet selected a builder, and can thereby have SAM lower or raise its bid to achieve maximum profitability while still under-bidding Davis. <u>See</u> Tr. at 4, 10-11. But Plaintiffs offer no evidence regarding any specific bid and only referred to this protectable interest at oral argument and in passing in their Reply. <u>See</u> <u>id.</u>; Reply at 10; <u>Lipton v. Nature Co.</u>, 71 F.3d 464, 469 (2d Cir. 1995) ("[M]ere conclusory allegations or denials in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist." (citation and internal quotation marks omitted)). Moreover, while knowledge of

pricing may constitute a trade secret, Teich argues that Davis's bids were not treated as confidential: they were not password protected and were available to all Davis employees with computer access, including non-sales personnel in the engineering and laboratory departments. Teich Decl. ¶ 71. Similarly, the reports salespeople prepared regarding their calls with clients—calls that presumably touched on bid amounts—were distributed to "a long list of people" and were not password protected. Id. ¶ 75. Moreover, Teich argues that customers share manufacturers' quotes with other manufactures. Id. ¶ 70. The overall lack of bids secrecy weighs against a finding that bids were trade secrets. Cf. Charter Oak Lending Group, LLC v. August, 127 Conn. App. 428 (App. Ct. 2011) (finding a trade secret where each employee had access only to information regarding her own customers, information was encrypted, and servers carrying information were locked).

Teich also alleges that customers "almost always" seek quotations from "several manufacturers." Teich ¶ 69. Davis's bids are thus of limited utility: SAM, were it to raise or lower its bids so as to achieve maximum profitability while still under-bidding Davis, would risk over- or under-bidding other manufacturers. Thus, on the present record, Davis has not demonstrated that Teich possess bid information constituting a trade secret.

### ii) Protectable Customer-Related Interests

#### 1) Customer Relationships

"Protection of customer relationships the employee acquired in the course of employment may indeed be a legitimate interest." BDO Seidman, 712 N.E.2d at 1224. However, for customer relationships to be protectable, the employee must have long-standing client relationships and her services must be "a significant part of the total transaction." Id. Plaintiffs point to Teich's "special and unique relationships" with Davis's existing and potential clients acquired by trading on Davis's

"good will." Reply at 9. But Plaintiffs do not specify what made these relationships unique or valuable. While Teich may have worked with customers over a long period of time and engaged in "focused and intelligent discussions . . . regarding the customization of liquid coating equipment," his relationships appear to have been devoid of any "personal" aspect. See Stevenson Decl. ¶¶ 9-13; cf. Sanford Hall Agency, Inc. v. Dezanni, No. CV044000576, 2004 WL 3090673, at *3 (Conn. Super. Ct. Dec. 2, 2004), at *3 (refusing to enforce restrictive covenant where employee's transactions with clients were "conducted largely over the phone and entertaining or socializing with the clients was extremely rare"). Moreover, most of Davis's customers are one-time purchasers, see Teich Decl. ¶ 85, and thus the customer relationships he developed are of limited value. See Vbrick, 2009 WL 1491489, at *9 (refusing to issue injunction where "most, if not all, of the customer relationships in question were not long-term relationships"); Sanford Hall, 2004 WL 3090673, at *3 (refusing to enforce restrictive covenant where employee's sales were a "one-time deal"); cf. Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc., 323 F. Supp. 2d 525, 532 (S.D.N.Y. Jun. 24, 2004) (enforcing noncompete where majority of employer's customers were "repeat users" because of, inter alia, employee's "client relationships"); Greystone Staffing, Inc. v. Goehringer, No. 13906-06, 2006 WL 3802202, at *3 (N.Y. Sup. Ct. Nov. 27, 2006) (finding protectable interest where employee's "significant" relationships had allowed employer to "compete for and obtain the patronage and repeat business of its customers."(emphasis added)). Plaintiffs have not shown that Teich's customer relationships constitute a protectable interest.

2) Customer Information

Lastly, Plaintiffs conclusorily point to Teich's knowledge of "customer specifications and needs" and "customer information." Mem. at 12. But, as discussed supra, to the extent Plaintiffs are referring to customer specifications for machinery, the record indicates that those specifications

are the proprietary information of the customer, not Davis, and have no utility beyond the specific project for which they are prepared. See Christie Decl. ¶¶ 33-36; Teich Decl. ¶ 67. Moreover, there is no evidence that Davis has expended significant resources in identifying customers and learning their needs and predilections. See generally Mem.; Reply; cf. Giffords Oil Co. v Wild, 483 N.Y.S.2d 104, 106 (App. Div. 1984) (finding protectable interest where plaintiff oil company expended "substantial time and money" to acquire list of customer information such as the "fuel oil capacity of customers' tanks, and the amount certain customers are willing to pay"). Rather, Defendants have offered unrebutted evidence that *customers* solicit bids from machining companies like Davis and SAM. Christie Decl. ¶¶ 33-36; Teich Decl. ¶ 67. Plaintiffs have not shown that they have a protectable interest in Teich's customer information.

### iii. Unique Employee

Even where there are no protectable trade secrets or customer information, a noncompete may be enforced under New York law where the employee is "special, unique or extraordinary " Ticor, 173 F.3d at 65. Connecticut courts also recognize this principle. See Samuel Stores, Inc. v. Abrams, 94 Conn. 248, 255 (1919); Conn. Bathworks Corp. v. Palmer, No. CV030081927S, 2003 WL 22006402, at * 3 (Conn. Super. Ct. Aug. 1, 2003). An employee's uniqueness turns on her "relationship to the employer's business" and must be analyzed on a "case-by-case" basis. Ticor, 173 F.3d at 65. It is not enough that an employee be "of value." Id. at 70. Plaintiffs argue, in passing, that Teich was such an employee because of his "unique set of skills." See Reply at 10.

Unique employees have generally been found to include "musicians, professional athletes, actors and the like"—individual performers who have "such ability and reputation that [their] place[s] may not easily be filled." Ticor, 173 F.3d at 70. Plaintiffs wisely do not contend that Teich constituted such a virtuoso. See generally Mem.; Reply. While they do note his impressive

knowledge and abilities, see Stevenson Decl. ¶ 13-14, they point to no authority suggesting that these skills are sufficient to render an employee sufficiently unique. See generally Mem.; Reply.

Uniqueness may also be premised on an employee's relationships with clients. See Ticor, 173 F.3d at 71. However, such relationships qualify only when they are a primary component of obtaining and retaining the client's services. See id. (finding uniqueness where salesman maintained client relationships "by the use of the substantial entertainment expense account" provided by his employer and where those relationships were particularly vital in light of the costs and terms of the employer's product being set by law). For the reasons discussed *supra*, Plaintiffs have not demonstrated that Teich possessed such relationships.[19]

c. Conclusion

The Court finds that Plaintiffs have not demonstrated a likelihood of success on the merits of their breach of contract claims because they have failed to demonstrate a likelihood that: (1) Teich was not released from the Employment Agreement's noncompete or that Teich's signing of the Stock Agreement was not the product of a unilateral mistake; and (2) there is any protectable interest requiring enforcement of the Agreements.

2. *Other Claims*

Plaintiffs' failure to demonstrate a likelihood of success on their breach of contract claims renders their other claims unlikely to succeed. As to Plaintiffs' tortious interference claims, "if the restrictive covenant is unenforceable, then there can be no cause of action for tortious interference

---

[19] Indeed, some courts, in light of the New York Court of Appeals' analysis in BDO Seidman of customer relationships as a protectable interests, have declined to consider whether an employee's customer relationships render her a unique employee and have instead focused exclusively on whether those relationships constitute protectable interest. See Silipos, 2006 WL 2265055, at *3 n.5.

with contract." <u>Savannah Bank v Sav. Bank of Fingerlakes</u>, 261 A.D.2d 917, 918 (N.Y. App. Div. 1999). As discussed *supra*, Plaintiffs have not demonstrated a likelihood that the Employment or Stock Agreements' restrictive covenants are enforceable. Regarding the claim for misappropriation of trade secrets, such a claim requires that there be a trade secret to misappropriate. <u>See</u> Conn. Gen. Stat. § 35-51(b); <u>Integrated Cash Mgmt.</u>, 920 F.2d at 173; <u>McIntire Co. v. Trent, Co.</u>, No. CV116010259, 2013 WL 6671213, at *5-6 (Conn. Super. Ct. Nov. 20, 2013). As discussed *supra,* Plaintiffs have not demonstrated a likelihood that there is such a trade secret. Likewise, Plaintiffs' claims alleging unfair competition and breach of the implied covenant of good faith and fair dealing are premised on the appropriation of trade secrets and other protectable information and the enforceability of the Agreements. Am Compl. ¶¶ 111-127. Thus, Plaintiffs have not demonstrated a likelihood of success on any of their claims.

### B. Serious Merits Question and Balance of the Equities

Even where a movant has not shown a likelihood of success, she may demonstrate sufficiently serious questions going to the merits of the case to make it a fair ground for litigation, and a balance of hardships tipping decidedly in favor of the moving party. <u>D.D.</u>, 465 F.3d at 510. For the reasons discussed *supra*, the Court finds that Plaintiffs have not presented evidence demonstrating a sufficiently serious question going to the merits. Nor have they demonstrated that the balance of the equities tips decidedly in their favor. Plaintiffs argue that it does because: (1) Teich agreed to be bound by the restrictive covenants; (2) Plaintiffs have protectable information and will suffer harm if it is disclosed to SAM; (3) Teich can find noncompeting work elsewhere; and (4) Teich provided strategy emails to SAM's managing director. <u>See</u> Resp. at 23-24; Reply at 12. But the Court has already found: (1) a likelihood that Teich did not agree to the Stock Agreement's noncompete and is released from the Employment Agreement's noncompete; and (2)

an absence of protectable interests. As to Plaintiffs' third argument, they offer a conclusory affidavit from Davis's Vice President of Human Resources, who states that Teich told him, during a "meeting" shortly prior to Teich's departure, "that he had opportunities for employment with companies that did not compete with Davis." Dkt. No. 32 ¶ 2. This affidavit, which provides no specifics and does not specify how "compet[ing]" was defined by the conversation's participants, is of little probative value. The Court finds it unlikely that Teich, who has spent the last eleven years of his career working exclusively in the liquid coating industry, see Am. Compl. ¶¶ 22-23, could find employment, or at the very least employment comparable in salary to his Davis and SAM positions, that did not involve any liquid coating work. Moreover, Teich has offered evidence of his significant financial commitments to his family and his very limited retirement income. Teich Decl. ¶¶ 87-88; see also Sylvan R. Shemitz Designs, Inc. v. Brown, No. CV136013145S, 2013 WL 6038263, at *11 (Conn. Super. Ct. Oct. 23, 2013) (finding the equities favored employee where he was the principal income earner for his family and former employer failed to point to any specific harm that would result from not granting a preliminary injunction); cf. Lumex, 919 F. Supp. at 629 (enforcing restrictive covenant where former employer compensated employee during period he was subject to the restriction). Finally, as to Teich's disclosure of emails to Christie, the nonprotectable nature of the information disclosed and the avowed legitimate purpose of the disclosure—ensuring, with SAM, that Teich's potential SAM employment would not violate the Agreements—renders the disclosure, while inadvisable, largely irrelevant to the balancing of the equities. See Dkt. No. 26-1 at 37-50; Christie Decl. ¶¶ 38, 42. The Court therefore finds that the balance of equities, if they tip, do so in Teich's direction. Thus, because Defendants have shown neither a likelihood of success on the merits or a sufficiently serious question going to the merits and the balance of hardships tipping decidedly in their favor, the Motion is denied.

## C. Irreparable Harm

Moreover, Plaintiffs have not demonstrated irreparable harm. "In non-compete cases . . . the irreparable harm analysis and the likelihood of success on the merits analysis are closely related and often conflated." Int'l Bus. Machines Corp. v. Visentin, No. 11 Civ. 399, 2011 WL 672025, at *7 (S.D.N.Y. Feb. 16, 2011). For the same reasons discussed *supra* —the inapplicability of the Agreements' noncompetes and the lack of protectable interests—the Court finds that Plaintiffs have not demonstrated irreparable harm.[20]

Even if the Court were to conclude that the Agreements' noncompete applied to Teich and that Plaintiffs had protectable interests, irreparable harm is shown only where there will be an injury that "cannot be remedied by an award of monetary damages." Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 332 (2d Cir. 1995); accord Moore v. Consol. Edison Co. of N. Y., Inc., 409 F.3d 506, 510 (2d Cir. 2005) ("Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances."). As Plaintiffs note, it is often true that it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come," Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 9 (2d Cir. 2004), and that the "loss of

_____

[20] A provision in the Stock Agreement stating that Plaintiffs would suffer irreparable harm and Teich could be enjoined from working for a competitor, see Stock Agreement § 10(b); Mem. at 5-6; does not change this analysis. While the Second Circuit has held that such a provision can be deemed an "admission," Ticor, 173 F.3d at 69, it is not dispositive. See Baker's Aid v. Hussmann Foodservice Co., 830 F.2d 13,16 (2d Cir. 1987) ("[C]ontractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate."); Firemen's Ins. Co. of Newark v. Keating, 753 F. Supp. 1146, 1154 (S.D.N.Y. 1990) ([I]t is clear that the parties to a contract cannot, by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate."). This is particularly so here because, as discussed *supra*, Teich agreed to the Stock Agreement's noncompete and related provisions pursuant to a unilateral mistake.

trade secrets cannot be measured in money damages" because a "trade secret once lost is, of course, lost forever." N. Atlantic Instruments, Inc. v. Haber, 188 F.3d 38, 49 (2d Cir. 1999). But the nature of Davis and SAM's business largely excepts this case from these general principles. Both parties' submissions indicate that their industry involves obtaining a few financially significant orders. See Am. Compl. ¶¶ 38; SAM Resp. at 8. If Davis subsequently loses any order to SAM, money damages would therefore be relatively easy to prove and would likely adequately compensate Davis for its loss.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the TRO (Dkt. No. 18) is, to the extent it remains in effect, **DISSOLVED**; and it is further

**ORDERED**, that the Motion (Dkt. No. 12) for preliminary injunctive relief is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:     February 10, 2014
           Albany, NY

Lawrence E. Kahn
U.S. District Judge